**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CRISTINA B.,[1]

              Plaintiff,

      v.

ANDREW M. SAUL,
Commissioner of Social Security,

              Defendant.

Case No. 5:20-cv-00873-AFM

**MEMORANDUM OPINION AND ORDER AFFIRMING DECISION OF THE COMMISSIONER**

      Plaintiff filed this action seeking review of the Commissioner's final decision denying her application for disability insurance benefits. In accordance with the Court's case management order, the parties have filed briefs addressing the merits of the disputed issues. The matter is now ready for decision.

**BACKGROUND**

      In July 2016, Plaintiff applied for disability insurance benefits, alleging that she became disabled on August 12, 2014. (Administrative Record ["AR"] 186-194.) Plaintiff's application was denied initially and on review. (AR 103-106, 110-114.)

---

[1] Plaintiff's name has been partially redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

On December 16, 2018, a hearing took place before an Administrative Law Judge ("ALJ"). Plaintiff (who was represented by counsel) and a vocational expert ("VE") testified at the hearing. (AR 32-72.)

In a decision dated February 12, 2019, the ALJ found that Plaintiff suffered from the following medically severe impairments: degenerative disc disease of the cervical and lumbar spine with radiculopathy; right knee arthritis; vertigo; and asthma. (AR 17.) The ALJ found that Plaintiff's medically determinable mental impairments and carpal tunnel syndrome were not severe. (AR 19.) The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following limitations: she can lift and carry 10 pounds frequently and 20 pounds occasionally; can stand and walk for six hours in an eight-hour day; can sit for six hours in an eight-hour day; can frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; can occasionally climb ladders, ropes and scaffolds, and reach overhead; and she must avoid concentrated exposure to fumes, odors, dusts, gases and hazards. (AR 20.) Relying on the testimony of the VE, the ALJ concluded that Plaintiff was able to perform her past relevant work as a bank teller. Alternatively, and also relying on the VE's testimony, the ALJ concluded that Plaintiff was also able to perform other jobs existing in the national economy, including cashier II, marker, and ticket seller. (AR 25-26.) Accordingly, the ALJ determined that Plaintiff was not disabled from August 12, 2014 through June 30, 2015, the last date insured. (AR 26.)

The Appeals Council denied review (AR 1-6), rendering the ALJ's decision the final decision of the Commissioner.

## DISPUTED ISSUES

1. Whether the ALJ erred at Step Two of the sequential evaluation process in finding that Plaintiff's mental impairment and carpal tunnel syndrome were not severe medical impairments.

2. Whether the ALJ erred in evaluating the opinion of Mark Ganjianpour,[2] M.D., Plaintiff's treating physician.

3. Whether the ALJ erred in discounting Plaintiff's subjective complaints.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). Under the substantial-evidence standard, this Court asks whether the administrative record contains sufficient evidence to support the Commissioner's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). As the Supreme Court observed in *Biestek*, "whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high." *Id*. It means "more than a mere scintilla" but less than a preponderance and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court must review the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

## DISCUSSION

### I. Whether the ALJ erred at Step Two.

Plaintiff contends that the ALJ erred at step two of the sequential evaluation process in determining that her mental impairments and carpal tunnel syndrome were not severe. (ECF No. 20 at 3-6.) The Commissioner argues that the ALJ properly assessed the medical evidence at Step Two and that Plaintiff failed to meet her burden

---

[2] Although the parties and the ALJ refer to Plaintiff's treating physician as Mark Ganjoanpoir, the correct spelling of this physician's last name is Ganjianpour. (*See* AR 1081.)

to show that she suffered from impairments that significantly limited her ability to perform basic work activities. (ECF No. 23 at 4-6.)

A.  Relevant Law

At Step Two of the sequential evaluation process, the claimant has the burden to show that he has one or more "severe" medically determinable impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 148 (1987); *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). The Step-Two inquiry is "a de minimis screening device [used] to dispose of groundless claims." *Webb*, 433 F.3d at 687 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)); *see also Edlund v. Massanari*, 253 F.3d 1152, 1158-1159 (9th Cir. 2001) (discussing this "de minimis standard").

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522, 416.922. Basic work activities means "the abilities and aptitudes necessary to do most jobs," including: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) & 416.921(b).

In determining whether a claimant's mental impairment is severe, an ALJ is required to evaluate the degree of mental limitation in the following four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting or managing oneself. If the degree of limitation in these four areas is determined to be "mild," a claimant's mental impairment is generally not severe, unless there is evidence indicating a more than minimal limitation in her ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520a(c)-(d), 416.920a(c)-(d).

B.  <u>Mental Impairments</u>

The ALJ found that Plaintiff's impairments of anxiety and depression caused a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing herself. (AR 18-19.) Because she found that Plaintiff's mental impairments caused no more than minimal limitations in her ability to perform basic mental work activities, the ALJ concluded that they were not severe. (AR 18-19.)

In her discussion of Plaintiff's mental health records, the ALJ noted that Plaintiff's mental status examinations were generally normal. (AR 22, citing AR 690-691,704-705, 710, 718, 738, 744, 781, 787, 5f 1181, 1183, 1190, 1194, 1201, 1202, 1205, 1214.)[3] The ALJ gave great weight to the opinions of the State agency physicians, both of whom reviewed the record and determined that Plaintiff's mental impairments resulted in no functional limitations and were not severe. (AR 25, citing AR 80 and 93.)[4]

The opinions of non-examining physicians may serve as substantial evidence so long as they are consistent with independent clinical findings or other evidence in the record. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002.) Here, as the ALJ noted, the State agency physicians reviewed the record through June 2, 2015, a record which showed normal mental status findings. The ALJ's characterization of the record is supported by substantial evidence. With the exception of a sometimes anxious or a depressed mood, Plaintiff's mental status examination findings were consistently normal throughout the record: her attire, grooming, hygiene and eye contact were appropriate; her behavior and manner were normal and cooperative; her

---

[3] Some of the records the ALJ cites in Exhibit 5F (that is, from AR 1181 through AR 1214) are in a different format than, but duplicative of, those cited in Exhibit 2F (that is, from AR 690 through AR 787).

[4] It appears that these are the only medical opinions regarding the extent, if any, of functional limitations resulting from Plaintiff's mental impairments.

affect was normal, appropriate, and mood congruent; her speech was normal; her thought process was coherent, relevant, and logical; she had no suicidal ideation, no psychotic or inappropriate thought content; she was alert and oriented; her concentration was normal; her judgment was unimpaired; and her insight was fair or average. (*See* AR 1214 (February 20, 2015), 690-691/1205 (March 24, 2015), 704-705/1202 (April 28, 2015), 709-710/1200-1201 (May 19, 2015), 737-738/1194 (June 2, 2015), 744 (June 6, 2015), 780-781/1182-1183 (June 29, 2015), 786-787/1181 (July 13, 2015).

Plaintiff argues that the State agency physicians did not review evidence post-dating June 2015, pointing out that she "has undergone mental health treatment prior to her date last insured," she participated in an "intensive psychiatric outpatient program," and she was diagnosed with major depressive disorder, recurrent, moderate with anxiety. (ECF No. 20 at 5, citing AR 738, 781, 793, 799, 826, 831, 837, 842, 847, 852, 871, 876, 881, 886, 892; ECF No. 24 at 2.) Many of the treatment records Plaintiff cites are the same as those discussed above. More importantly, none of the treatment records is substantively different than those discussed above. That is, they reflect that Plaintiff received psychotherapy for depression and anxiety. The only positive clinical finding is a sometimes depressed or anxious mood, or an observation that Plaintiff was tearful. (AR 793 (August 2015); 799 (September 2015); 826-827, 831 (November 2015); 837, 847, 852 (December 2015); 871, 876, 881, 886 (January 2016); 892 (February 2016).) Plaintiff emphasizes that she was diagnosed with anxiety disorder and depression and that during an individual psychotherapy session she reported "overwhelming anxiety." (ECF No. 24 at 2.) The existence of an impairment, diagnosis, or symptom, however, does not mean that Plaintiff suffered from a significant limitation in her ability to perform work activities. To the contrary, standing alone, neither a diagnosis nor a claimant's subjective complaints are sufficient to demonstrate severity at Step Two. *See Draiman v. Berryhill*, 2018 WL 895445, at *7 (C.D. Cal. Feb. 13, 2018) (claimant's

"diagnoses of Major Depressive Disorder and Generalized Anxiety Disorder are insufficient to demonstrate that she has a severe mental impairment" at step two); *Gahagan v. Colvin,* 2013 WL 4547868, at *6 (E.D. Wash. Aug. 28, 2013) ("that certain diagnoses exist in the record does not establish that they are severe or cause disabling symptoms) (citing *Key v. Heckler*, 754 F.2d 1545, 1549-1550 (9th Cir. 1985) (diagnosis alone does not establish severity).

Plaintiff also objects to the ALJ's reliance upon her ability to use a computer and take care of three dogs in reaching the non-severity finding. Plaintiff argues that "the ability to feed three dogs or occasionally use a computer does not equate to mild or no mental limitations, particularly when pets are a well known supportive technique used in the mental health community to help patients cope with depression and stress, i.e. emotional support animals." (ECF No. 20 at 4-5.)[5] Contrary to Plaintiff's suggestion, it was appropriate for the ALJ to consider Plaintiff's ability to use a computer and take care of three dogs in analyzing the severity of a mental impairment at step two. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2) (in assessing severity of a mental impairment, the Commissioner considers whether it interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."). Finally, the ALJ's conclusion that Plaintiff's mental impairments did not impose significant limitations is supported by substantial evidence as set forth above. As such, any error has no bearing on the ALJ's decision.

Next, Plaintiff argues that the ALJ improperly relied upon her own observations of Plaintiff's ability to function at the hearing. (ECF No. 20 at 4.) Although courts generally condemn an ALJ's reliance upon personal observations, this is not a case where the ALJ substituted her own lay judgment in the place of a

---

[5] The Court notes that Plaintiff does not allege, and nothing in the record indicates, that her three dogs qualify as "emotional support animals."

medical diagnosis. Instead, the ALJ relied, in part, upon observations that Plaintiff's conduct at the hearing was inconsistent with alleged impaired concentration or social function. This was not an improper consideration. *See Orn*, 495 F.3d at 639-640 (while an ALJ may not rely solely on personal observations to discount a claimant's testimony, the ALJ may use those observations in context with other indicators of the claimant's credibility in evaluating testimony); *Estrada v. Colvin*, 2016 WL 1181505, at *10 (E.D. Cal. Mar. 28, 2016) (ALJ was entitled to consider observations that claimant was able to participate in the hearing without distraction, which contradicted hearing testimony regarding maintaining concentration); *Obiora v. Astrue*, 2012 WL 628144, at *4 (C.D. Cal. Feb. 27, 2012) (ALJ properly considered that the claimant, inconsistent with his allegations of difficulty concentrating and following instructions, "behaved appropriately" at the hearing and was able to make arguments on his own behalf).

In sum, the ALJ's determination that Plaintiff's mental impairments imposed no more than minimal limitation on Plaintiff's ability to perform work related activity is supported by substantial evidence. *See Davenport v. Colvin*, 608 F. App'x 480, 481 (9th Cir. 2015) (in reviewing step two determination, the Court considers whether "the ALJ had substantial evidence to find that the medical evidence clearly established that" Plaintiff did not have a severe mental impairment); *Sevier v. Colvin*, 2014 WL 1247369, at *6 (E.D. Cal. Mar. 25, 2014) (ALJ's finding of non-severity supported by substantial evidence where record did not "reflect any functional limitations associated with Plaintiff's diagnoses of major depressive disorder, posttraumatic stress disorder, and panic disorder with agoraphobia").

C. Carpal Tunnel Syndrome

The ALJ noted a diagnosis of carpal tunnel syndrome and the EMG findings from April 13, 2015, which revealed moderate right and mild left carpal tunnel syndrome with no evidence of cervical radiculopathy. (AR 21.) In concluding that Plaintiff's carpal tunnel syndrome was not severe, the ALJ observed that Plaintiff

received little or no treatment for that impairment through the date last insured – that is, June 30, 2015. (AR 19.) The ALJ reasoned that Plaintiff would have obtained more treatment if her impairment had caused significant pain or limitations prior to the date last insured.

As mentioned, the mere diagnosis of an impairment does not establish disability. *See Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990). While Plaintiff repeatedly cites the same medical record the ALJ acknowledged, she points to no medical evidence supporting the conclusion that her carpal tunnel syndrome imposed a significant functional limitation on her ability to perform work-related activities prior to the date last insured. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164-1165 (9th Cir. 2008) (ALJ did not err at step two by failing to classify carpal tunnel syndrome as a severe impairment where the medical record did not establish work-related limitations).

Plaintiff argues that her lack of treatment was due to the fact that she was dependent upon the approval of workers compensation insurance. (ECF No. 20 at 5-6.) She points to treatment notes reflecting slightly decreased strength of her bilateral upper extremities, decreased sensation and numbness in her radial digits, trigger fingers, and decreased grip strength. (AR 1086, 1088, 1091, 1097, 1106, 1109, 1120, 1124, 1132.) Even assuming that the ALJ erred by relying on a lack of treatment, the fact remains that the record fails to suggest any significant functional impairment resulting from carpal tunnel syndrome. Furthermore, even if the ALJ erred at Step Two by finding Plaintiff's carpal tunnel syndrome non-severe, the error was harmless because the ALJ nevertheless considered Plaintiff's carpal tunnel syndrome when determining Plaintiff's RFC at step four. (*See* AR 21-22.) *See Davenport,* 608 F. App'x at 481 ("any error regarding the step-two determination is harmless because the ALJ proceeded to step five and considered Davenport's mental impairments as part of that analysis"); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (failure to address particular impairment at step two is harmless if the ALJ fully evaluated the

claimant's medical condition in later steps of sequential evaluation process); *Kemp v. Berryhill*, 2017 WL 3981195, at *5 (C.D. Cal. Sept. 8, 2017) (any error at step two was harmless because the ALJ subsequently considered mental health issues in assessing the claimant's RFC, although the ALJ found mental health issues did not cause any limitation).

## II. Whether the ALJ provided legally adequate reasons for rejecting Dr. Ganjianpour's opinion.

Plaintiff contends that the ALJ failed to provide legally sufficient reasons for rejecting the opinion of Dr. Ganjianpour, her primary treating physician. (ECF No. 20 at 6-8.)

### A. Relevant Law[6]

The medical opinion of a claimant's treating physician is entitled to controlling weight so long as it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). If a treating physician's medical opinion is uncontradicted, the ALJ may only reject it based on clear and convincing reasons. *Trevizo*, 871 F.3d at 675; *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). If a treating physician's opinion is contradicted, the ALJ must provide specific and legitimate reasons supported by substantial evidence in the record before rejecting it. *Trevizo*, 871 F.3d at 675; *Ghanim v. Colvin*, 763 F.3d 1154, 1160-1061 (9th Cir. 2014). The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

---

[6] The rules for the evaluation of medical evidence at the administrative level have been revised for disability applications which were filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Because Plaintiff filed her application on July 6, 2016, the revised regulations do not apply.

interpretation thereof, and making findings." *Trevizo*, 871 F.3d at 675 (citations and internal quotation marks omitted).

B. <u>Relevant Medical Evidence</u>

Dr. Ganjianpour treated Plaintiff for the physical impairments she sustained in a fall at work on August 12, 2014 – specifically, Plaintiff's neck, back, hip and shoulder injuries as well as carpal tunnel syndrome. Accordingly, the Court's summary of the medical record is limited to evidence related to those impairments.[7]

Plaintiff was first evaluated by Dr. Ganjianpour on December 15, 2014. (AR 1127.) Dr. Ganjianpour reviewed x-rays which revealed disc space narrowing at C5-C6, but no abnormal ossification or calcification. X-ray of Plaintiff's lumbar spine was unremarkable. X-rays of Plaintiff's bilateral shoulders showed a 2-B arch and no other abnormal ossification or calcification. X-rays of Plaintiff's right hand, right "tib-fib," and pelvis were all within normal limits. (AR 1136.) Dr. Ganjianpour's impression was that Plaintiff suffered numerous sprains/strains and contusions. (AR 1136-1137.) He stated that EMGs and NCVs were indicated and recommended 12 sessions of physical therapy, anti-inflammatory medication and a muscle relaxant. (AR 1137.)

A follow-up examination in February 2015 revealed positive Phalen's and Tinel's of the right wrist; decreased grip strength; stiffness and spasm of the lower lumbar spine; and positive straight leg raise. Dr. Ganjianpour noted that he had not yet received the MRI results. EMGs of Plaintiff's lower extremities showed left-sided L5 radiculopathy. (AR 1124.)

In a progress report dated April 13, 2015, Dr. Ganjianpour noted positive Phalen's and Tinel's bilateral wrists and "some stiffness and spasm" of the cervical

---

[7] Based upon the record and Plaintiff's brief, it appears that Plaintiff's impairments related to her fall, including her neck, back, shoulder, hip, and carpal tunnel syndrome, were treated exclusively by Dr. Ganjianpour. Although Plaintiff received treatment at Kaiser Permanente for numerous other ailments – including anxiety, hypertension, osteoarthritis of the left ankle, asthma, obesity, depression, and an ankle sprain – she was not treated for the physical impairments upon which Dr. Ganjianpour's opinion was based. (*See* AR 1144 ("List of Problems").)

spine. (AR 1120.) He reviewed EMGs of Plaintiff's upper extremities, which showed moderate right and mild left carpal tunnel syndrome with no evidence of cervical radiculopathy. He also reviewed the MRI of Plaintiff's cervical spine, which revealed small disc herniations at multiple levels more significantly at C6-C7 and a 3 mm disc bulge causing bilateral nerve root compromise. (AR 1120-1121.)

In May 2015, Dr. Ganjianpour reported that Plaintiff had spasm and stiffness of the cervical and lumbar spine. She also was limping. (AR 1117.) Plaintiff complained of fainting and dizziness. She reported falling, which exacerbated her neck and back conditions. Dr. Ganjianpour recommended physical therapy and refilled Plaintiff's prescription for Flexeril (a muscle relaxant). (AR 1118.)

Physical examination findings in July 2015 consisted of stiffness about the neck and back with L5 radiculopathy. (AR 1113.) Dr. Ganjianpour indicated that he would request a spine specialist for Plaintiff's neck and lumbar spine. (AR 1114.)

An examination in August 2015 revealed stiffness and spasm of the cervical spine; spasm of the lumbar spine with positive straight leg raise; positive Phalen's and Tinel's; and decreased grip strength. Dr. Ganjianpour noted that they were awaiting authorization for a spine specialist and that he would request physical therapy for Plaintiff's carpal tunnel syndrome. (AR 1109-1110.)

Dr. Ganjianpour's progress report from October 2015 indicated Plaintiff continued to have stiffness and spasm of the neck and some radicular pain down the right side with positive Phalen's and Tinel's of both wrists. (AR 1106.) He recommended physical therapy and continued her with muscle relaxant medication. (AR 1107.) Similarly, examination in November 2015 revealed stiffness and spasm of the neck; positive Phalen's and Tinel's of both wrists; and stiffness and spasm of the lumbar spine. Dr. Ganjianpour noted that Plaintiff had attended three of the six authorized sessions of physical therapy, but reported that it had "not yielded much result." (AR 1101-1102.)

In his January 2016 examination, Dr. Ganjianpour found positive Phalen's and Tinel's of both wrists; positive Spurling and Lhermitte down bilateral shoulders; numbness in radial three digits; triggering of left middle finger; and positive straight leg raise of the lumbar spine with radiation to the right leg. (AR 1097-1098.) Plaintiff received an injection inside the right wrist carpal tunnel area, which she tolerated well. He discussed the possibility of carpal tunnel release and trigger finger release, depending upon how she responded to the injection. (AR 1098.)

Plaintiff was next seen by Dr. Ganjianpour on May 2, 2016, when he conducted a final examination and prepared a Permanent and Stationary Medical-Legal Report. The report sets out a background of Plaintiff's injury, work history, and complaints. (AR 1081-1084.) The examination performed on that date revealed Jamar grip strength 2/2/0/0/0 right and 2/4/2/2/2 left;[8] limited range of motion in the lumbar and cervical spine; decreased sensation in thumb/index/long finger; positive leg raising at 70 degrees bilaterally; some pain in wrist and knee palpation and knee; edema in the left ankle; "some decreased grip strength," and mild triggering of the middle fingers, however it was not "significant." (AR 1086, 1088-1091.) Under a heading entitled "Gait," Dr. Ganjianpour reported that Plaintiff "walks without a limp" and was able to walk on toes and heels. (AR 1089). In the same examination, however, under a heading entitled "Ambulation," Dr. Ganjianpour indicated "[t]here is limp" and Plaintiff "is unable to toe walk and heel walk." (AR 1091.) Examination of Plaintiff's shoulders and hips was normal. (AR 1087, 1089.) A neurological examination also was normal. (AR 1088).

Under the heading "Impression," Dr. Ganjianpour found that Plaintiff suffered from the following: cervical spine disc herniation C6-C7 causing bilateral nerve root compromise with radiation to the upper extremities; bilateral middle finger trigger finger, occasionally symptomatic; bilateral carpal tunnel syndrome confirmed by

---

[8] With regard to the Jamar grip testing, Dr. Ganjianpour stated that he did not believe that Plaintiff "has provided maximum effort." (AR 1094.)

EMG, status post one right-sided injection with minimal improvement; lumbar spine multilevel disc herniations with nerve root compromise at L5-S1; right hip mild greater trochanteric bursitis; and left ankle chronic sprain with instability. (AR 1091-1092.) He reported that he treated Plaintiff with physical therapy, anti-inflammatory medication and diagnostic testing and that Plaintiff had some improvement. Dr. Ganjianpour indicated that he had discussed the possibility of carpal tunnel release surgery, but Plaintiff was not interested. He noted that Plaintiff's complaints of headaches, dizziness, trouble sleeping, and left ankle sprain were being treated at Kaiser under Plaintiff's private insurance. He also noted that he had requested authorization for a neurological evaluation and a spinal specialist, but treatment was not authorized. (AR 1091-1092.)

In Dr. Ganjianpour's opinion, Plaintiff was limited to sedentary/desk work; she could lift a maximum of five pounds; she was precluded from repetitive gripping, grasping, pulling, pushing, torqueing, bending, stooping, as well as from prolonged standing or walking. (AR 1093.)

C. Analysis

Because Dr. Ganjianpour's opinion was contradicted by the opinions of the State agency physicians, the ALJ was required to provide specific and legitimate reasons for rejecting it. Here, the ALJ concluded that Dr. Ganjianpour's opinion was entitled to little weight and provided the following reasons: It is not supported by objective evidence and is inconsistent with the record as a whole; Dr. Ganjianpour "primarily summarized in the treatment notes the claimant's subjective complaints, diagnoses, and treatment, but did not provide objective clinical or diagnostic findings to support the functional assessment"; his "opinion is inconsistent with the objective findings … which show no more than moderate findings"; and his opinion is inconsistent with Plaintiff's admitted activities of daily living. (AR 23.)

An ALJ may properly reject a treating physician's opinion that is unsupported by clinical findings. *See Chaudhry v. Astrue,* 688 F.3d 661, 671 (9th Cir. 2012);

*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Here, in discussing the medical record, the ALJ observed that findings from physical examinations and objective tests were often negative revealed mild findings. Specifically, the ALJ discussed the November 2014 MRI which showed disc bulges at L4-5 and L5-S1 and an EMG/NCS which revealed chronic left L5 radiculopathy. (AR 21, citing AR 1124,  1141.) She noted a physical examination on March 6, 2015 revealed normal range of motion, reflexes, gait and coordination, no edema or tenderness, and no cranial nerve deficit. (AR 21, citing AR 1209.) The ALJ also noted that focal examination of Plaintiff's back, neck, bilateral shoulders and arms were all within normal limits on March 26, 2015. (AR 21, citing AR 1204.)

The ALJ observed that, "[e]ven when [Plaintiff] had positive findings, they were often mild and never more than moderate." (AR 21.) For example, the ALJ pointed to Plaintiff's EMG revealing mild left and moderate right carpal tunnel syndrome with no evidence of cervical radiculopathy as well as a cervical spine MRI showing small disc herniations at multiple levels, most significantly at C6-7, and a disc bulge causing bilateral nerve root compromise. (AR 21, citing AR 1120-1121.) The ALJ also noted that a physical examination performed on June 6, 2015 revealed Plaintiff's gait was intact and Romberg was negative. (AR 22, citing AR 1192.)[9] Additional findings from that examination showed Plaintiff's muscle strength in upper and lower extremities was 5/5; her sensation was intact; she was alert and oriented; her recent and remote memory were normal; her attention span, concentration were normal; and the CT scan of her brain was normal. (AR 1192.)

The ALJ considered Plaintiff's physical impairments, including degenerative disc disease of the cervical and lumbar spine with radiculopathy, and concluded that she was limited to light work. Plaintiff objects to that conclusion, emphasizing that the clinical findings demonstrate small disc herniations and a disc bulge with nerve

---

[9] The treatment notes from June 6, 2015 are from Kaiser Permanente and reflect that the examination was a consultation performed to review Plaintiff's complaints of headache, imbalance, and vertigo after her August 2014 accident. (AR 1191-1192.)

root compromise. Plaintiff, however, cites no authority for the proposition that a small herniation and disc bulge with nerve root compromise supports Dr. Ganjianpour's extreme functional limitations restricting Plaintiff to lifting no more than five pounds and precluding her from prolonged standing or walking. Instead, Plaintiff's argument amounts to a disagreement as to how the evidence should be interpreted. However, so long as the ALJ's interpretation of the record is rational and supported by substantial evidence, which it is here, the Court may not disturb it. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[I]f evidence is susceptible of more than one rational interpretation, the decision of the ALJ must be upheld.").

In light of the record, the ALJ's determination that Dr. Ganjianpour's extreme functional limitations – such as restricting Plaintiff to lifting no more than five pounds and precluding her from prolonged standing or walking – were inconsistent with his own findings as well as the overall medical evidence is supported by substantial evidence. *See Daniel S. v. Saul,* 2020 WL 1915894, at *4 (E.D. Wash. Feb. 24, 2020) (ALJ's interpretation of the record as showing "generally mild results" was rational and supported by substantial evidence, where evidence included MRI revealing mild disc bulging, posterior disc herniation, and mild compression of the S1 nerve root with a marked severity rating); *Charles B. v. Berryhill*, 2019 WL 1014781, at *6 (C.D. Cal. Mar. 4, 2019) (ALJ properly rejected treating physician opinion for lack of objective support where MRI showed small disc bulges, mild to moderate foraminal stenosis, but no central canal stenosis or root impingement); *Coelho v. Astrue*, 2011 WL 3501734, at *6 (N.D. Cal. Aug. 10, 2011) (ALJ met his burden of providing a specific, legitimate reason to reject the treating physicians' opinions for lack of supporting objective evidence where evidence of cervical spine condition included an MRI showing stenosis, disc narrowing, desiccation, and posterior disc bulging, but normal cord signal), *aff'd, Coelho v. Colvin*, 525 F. App'x 637 (9th Cir. 2013). Accordingly, the ALJ properly relied upon on a lack of objective

clinical support and inconsistency with the record to discount Dr. Ganjianpour's opinion.

**III.    Whether the ALJ properly evaluated Plaintiff's subjective complaints.**

Plaintiff contends that the ALJ erred in evaluating Plaintiff's subjective complaints. (ECF No. 20 at 8-13.)

A.  Plaintiff's Subjective Complaints

Plaintiff alleged that she is disabled due to back, hip, and shoulder injury – right side, asthma, depression, unbalance, neuropathy, carpal tunnel syndrome in both hands, high blood pressure, anxiety, migraines, trigger in hands and feet, and limited range of motion in the neck, hip, legs and ankles. (AR 221.) She alleged that these injuries resulted in constant pain, unbalance, and migraines which in turn caused her depression and anxiety. (AR 222.) At the hearing, Plaintiff testified about the injuries in the August 14, 2014 work-related accident in which she slipped and "flew into the door." She suffered a lump on her head, her back, hip, and ribs were bruised, and she had a gash in her leg. (AR 43.) Since then, she continued to suffer pain that travels from her neck to her right shoulder blade on her right shoulder; pain and spasm in her lower back; and her feet will go numb. With regard to carpal tunnel syndrome, Plaintiff testified that she is unable to grip, and has problems doing simple things such as tying her shoes or buttoning her shirt. If Plaintiff writes for too long, her hand cramps and gets numb, and she gets trigger finger. She suffers from weekly headaches and migraines. She also gets dizzy and falls down. She also has instability in her left ankle. As a result of multiple issues, she must be careful walking. She has anxiety around people because she fears someone will bump into her and she will fall. Plaintiff explained that her depression caused her to sleep a lot during the day and some days she would not get out of bed at all. Plaintiff was also forgetful and had to have "little alarms to tell [her] when to do things." (AR 44-53.)

Plaintiff estimated that after the accident, she was able to sit for about 20 to 30 minutes at a time before her hip or neck would hurt. She estimated she was able to

stand or walk for about 20 or 30 minutes before she would need to sit down. Plaintiff believed she could lift at most eight or nine pounds. (AR 58-60.)

Plaintiff reported that she took the following medications: Combivent and an inhaler for asthma; Lisinopril for high blood pressure medication; Lorazepam for anxiety; Flexeril (a muscle relaxant) at night. When necessary, she also took medication for vertigo, migraines. She had recently been prescribed Lyrica to see if it would help with pain. (AR 54-56.)

As for daily activities, Plaintiff testified that in 2014-2015, she would wake up, have coffee, "play" in the kitchen a little, and sit and watch TV. Later she would go outside and sit so that her dogs could play. She would microwave food for herself. She was able to grocery shop on her own. Plaintiff could do small loads of laundry and do the dishes. She had no trouble showering on her own. She was able to drive "locally," but essentially only drove to doctors' appointments. (AR 37, 62.)

B. Relevant Law

Where, as here, a claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms and the ALJ has not made an affirmative finding of malingering, an ALJ must provide specific, clear and convincing reasons before rejecting a claimant's testimony about the severity of his symptoms. *Trevizo*, 871 F.3d at 678 (9th Cir. 2017) (citing *Garrison*, 759 F.3d at 1014-1015). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). The ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1991) (en banc)).

1    Factors an ALJ may consider when making such a determination include the

2    objective medical evidence, the claimant's treatment history, the claimant's daily

3    activities, unexplained failure to pursue or follow treatment, and inconsistencies in

4    testimony. *See Ghanim*, 763 F.3d at 1163; *Molina v. Astrue*, 674 F.3d 1104, 1112

5    (9th Cir. 2012).

6         C.   Analysis

7         After summarizing Plaintiff's subjective complaints, the ALJ partially

8    discounted them, concluding that they were not entirely consistent with the record.

9    As the Commissioner points out, the ALJ provided the following reasons for

10   discounting Plaintiff's allegations: (1) the objective medical evidence did not support

11   the extent of Plaintiff's alleged pain and limitations; (2) Plaintiff had not received the

12   type of medical treatment one would expect for a totally disabled individual; and (3)

13   despite her alleged impairments, Plaintiff had engaged in a somewhat normal level

14   of daily activity. (ECF No. 23 at 10-12; *see* AR 21-22.)

15        1.   Objective Evidence

16        "Although lack of medical evidence cannot form the sole basis for discounting

17   pain testimony, it is a factor that the ALJ can consider in his credibility analysis."

18   *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *see Batson*, 359 F.3d at 1197

19   (lack of objective medical evidence to support claimant's subjective complaints

20   constitutes   substantial   evidence   in   support   of   an   ALJ's   adverse   credibility

21   determination). Here, the ALJ found that the objective evidence did not support the

22   extreme limitations alleged by Plaintiff. After discussing all of the evidence,

23   including the MRI and EMG results, the ALJ observed:

24        the longitudinal record shows that [Plaintiff] had no motor or sensory

25        loss and a full range of motion; notes also indicate that [Plaintiff] had

26        normal gait, 5/5 (full) strength, normal reflexes, no muscle wasting, and

27        no focal motor or sensory deficits. These objective findings demonstrate

28        the absence of muscle atrophy or weakness, unilaterally decreased lower

1   extremity reflexes, or sensory abnormalities. There were thus no clinical
2   signs of nerve root compression or any other condition which could
3   cause the chronic disabling back pain alleged by the claimant, and the
4   medical record, otherwise, documents no such clinical signs.

5   (AR 22.) Consequently, while the ALJ afforded some weight to Plaintiff's subjective
6   complaints and imposed limitations in excess of those opined by the State agency
7   physicians, she rejected them to the extent that they suggested Plaintiff suffered from
8   more pain and limitation than incorporated in the ALJ's RFC. As set forth in detail
9   above, the objective medical evidence reveals mild to moderate physical
10  impairments. In light of the record, the ALJ properly relied upon the absence of
11  objective medical support as one factor in her decision to partially discount Plaintiff's
12  subjective complaints.

13          2.  Conservative treatment

14          Observations regarding the relatively conservative nature of a claimant's
15  treatment properly may factor into the evaluation of a claimant's subjective
16  complaints. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039-1040 (9th Cir. 2008);
17  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007). Here, the ALJ discounted
18  Plaintiff's subjective complaints because the treatment she received was not what
19  one would expect for a totally disabled individual. The ALJ explained that the record
20  revealed that Plaintiff received no consistent treatment for musculoskeletal issues
21  during the dates in issue. In addition, the ALJ observed that Plaintiff received routine,
22  conservative and non-emergency treatment since the alleged onset date. (AR 21.)

23          As set forth above, Plaintiff's treatment for her allegedly disabling
24  musculoskeletal impairments consisted of ten office visits with Dr. Ganjianpour over
25  the course of a year and a half, a handful of physical therapy sessions, and a single
26  injection for her carpal tunnel syndrome. Further, for her allegedly disabling
27  impairments, Dr. Ganjianpour prescribed muscle relaxants and anti-inflammatory
28  medication. Courts have upheld an ALJ's characterization of treatment as

conservative even where the treatment includes narcotic pain medication paired with epidural injections. *See Martin v. Colvin*, 2017 WL 615196, at *10 (E.D. Cal. Feb. 14, 2017) ("[T]he fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment as a whole was conservative, particularly when undertaken in addition to other, less invasive treatment methods."); *Zaldana v. Colvin*, 2014 WL 4929023, at *2 (C.D. Cal. Oct. 1, 2014) (a treatment regimen including Tramadol and "multiple steroid injections" was conservative); *see also Huizar v. Comm'r of Social Sec.*, 428 F. App'x 678, 680 (9th Cir. 2011) (ALJ properly discounted subjective complaints where claimant responded favorably to conservative treatment, which included "the use of narcotic/opiate pain medications"). Here, Plaintiff was not prescribed narcotic medication, nor did she seek or receive any treatment more invasive than the single injection for her carpal tunnel syndrome. Given this record, the ALJ's characterization of Plaintiff's treatment as relatively conservative is supported by substantial evidence, and therefore the ALJ properly relied upon such to discount Plaintiff's testimony.[10]

### 3.  Daily activities

The ALJ found that Plaintiff had engaged in "a somewhat normal level of daily activity and interaction." (AR 21.) As support for this conclusion, the ALJ explained that Plaintiff "admitted activities of daily living including she lived alone, took care

---

[10] Plaintiff does not specifically argue that the ALJ mischaracterized her treatment as conservative. However, in arguing that her carpal tunnel syndrome was a severe impairment, Plaintiff alleges that the lack of treatment was due to the fact she was "at the mercy of the workers compensation insurance to approve any and all treatments." (ECF No. 20 at 5-6.) While an ALJ may not make adverse inferences from a lack of treatment where a claimant is uninsured or unable to afford treatment, *see Orn*, 495 F.3d at 638, this is not such a case. Plaintiff had private health insurance with Kaiser Permanente during the relevant time period. Thus, her minimal treatment appears to be based upon Plaintiff's choice to seek treatment only within the confines of a workers' compensation claim rather than obtain it at Kaiser Permanente, where she was treated for her other ailments. Plaintiff does not explain why – if she was suffering from the extreme disabling pain and symptoms she alleges – she could not seek treatment through her primary health providers.

1    of three dogs, and could drive"; she "admitted she was using a computer for online

2    dating," and she "was in a relationship in June of 2015." (AR 21.)

3         Generally, "[e]ngaging in daily activities that are incompatible with the

4    severity of symptoms alleged can support an adverse credibility determination."

5    *Ghanim*, 763 F.3d at 1165. Plaintiff contends that her admitted activities are not

6    readily transferable to a work environment. (ECF No. 20 at 9-10.) The Commissioner

7    counters that the activities need not be commensurate with full-time work to support

8    the conclusion that her subjective complaints were not fully credible. Rather,

9    Plaintiff's activities need only show that she exaggerated her symptoms or limitations

10   because they contradict her claims of a totally debilitating impairment. (ECF No. 23

11   at 11.)

12        While the Commissioner may be correct, none of the activities cited by the

13   ALJ appears to be inconsistent with her allegations of pain and limitations. At least

14   without further explication, it is not clear to the Court that Plaintiff's ability to "live

15   alone," use a computer for online dating, sit outside while her dogs played, and drive

16   to doctor's appointments, or "be in a relationship" contradict her subjective

17   testimony. Nevertheless, any error in this regard was harmless in light of the other

18   legally sufficient reasons provided by the ALJ. *See Molina*, 674 F.3d at 1115 (where

19   one or more reasons supporting ALJ's credibility analysis are invalid, error is

20   harmless if ALJ provided other valid reasons supported by the record); *Carmickle v.*

21   *Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-1163 (9th Cir. 2008) (same).

22                     **ORDER**

23        IT IS THEREFORE ORDERED that Judgment be entered affirming the

24   decision of the Commissioner of Social Security and dismissing this action with

25   prejudice.

26   DATED: 2/2/2021

27                      ALEXANDER F. MacKINNON

                   UNITED STATES MAGISTRATE JUDGE

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28